**Robert W. Wilkinson,** OSB No. 993983
rwilkinson@balljanik.com
**Justin D. Monahan**, OSB No. 065839
jmonahan@balljanik.com
BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, Oregon  97204-3219
503-228-2525
Fax 503-226-3910

[Additional Counsel appear on signature page]

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| MICHAEL HARNEY, an individual; and OZZIE GILBERT, an individual;<br><br>       Plaintiffs, on their own behalf and on behalf of all others similarly situated,<br><br>   v.<br><br>ASSOCIATED MATERIALS, LLC, dba ALSIDE, and dba GENTEK BUILDING PRODUCTS, INC., a Delaware limited liability company; and ASSOCIATED MATERIALS INCORPORATED, dba ALSIDE, and dba GENTEK BUILDING PRODUCTS, INC., a Delaware corporation,<br><br>       Defendants. | Case No. 3:16-cv-1587-SI<br><br>**SECOND AMENDED CLASS ACTION ALLEGATION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

/ / /

/ / /

Page 1 – SECOND AMENDED CLASS ACTION ALLEGATION COMPLAINT

1118567v3

## NATURE OF THE ACTION

1.

Plaintiffs Michael Harney and Ozzie Gilbert (the "Named Plaintiffs," described in greater detail herein) bring this consumer class action against Associated Materials, LLC, dba Alside Building Products, Inc., and Associated Materials Incorporated, dba Alside Building Products, dba Gentek Building Products, Inc. (collectively "AMI"), on behalf of all persons and entities who own or owned homes or other structures physically located in the United States on which AMI vinyl siding products ("Siding") are or were installed (the "Class" and "Class Members").

2.

This lawsuit arises out of damages sustained by the Named Plaintiffs and the Class Members that were proximately caused by AMI's Siding used in the construction of the Named Plaintiffs' and Class Members' homes and other structures, or which was otherwise installed on the homes and structures of the Named Plaintiffs and the Class Members.

3.

AMI sold or distributed Siding throughout the United States for installation on homes, commercial buildings, and other structures, both directly to consumers and through Defendants' established network of distributors and suppliers.  At all material times, AMI marketed and represented the Siding to be, for example, "no ordinary siding," and "the result of years of intensive research and development, giving you a vinyl siding of the highest standards." (Warranty Documentation, Exhibit A to this pleading).  AMI's websites were generally available to the Named Plaintiffs and the Class.  Specifically, AMI sold its Siding for installation on the property of the Named Plaintiffs and the Class Members with a "lifetime warranty" against

Page 2 – SECOND AMENDED CLASS ACTION ALLEGATION COMPLAINT

blistering, corroding, flaking and peeling as a direct result of defects occurring in the manufacturing process.

4.

On information and belief, as applicable to Plaintiffs Harney and Gilbert, the express warranty purported to exclude "damages or material failure including, but not limited to, normal weathering, oxidation, Acts of God, fire, flood, impact from foreign objects, chemical pollutants, mildew, structural defects, negligent maintenance or abuse." (Exhibit A, AMI's 2003-era Alside Warranty). The warranty was for the natural life of an original owner, or for 50 years if the property were sold. AMI's 2003-era Alside Warranty provided as follows: "If Alside determines that a claim is valid in accordance with the terms of this Warranty, Alside agrees, at its sole option, to repair, refinish, or replace only the defective siding panels and assume 100% of the cost of material and labor to the Property Owner." Consumers, as well as those within the construction industry, appropriately relied on the warranty and on AMI's marketing statements to mean that the Siding was and is expected to have an estimated useful life of 50 years at least. Further, consumers and those within the construction industry expected that if the Siding were to become "blistered, corroded, flaked, or peeled" during that warranty period, that AMI would repair or replace it.

5.

Contrary to these representations and this understanding, however, the Siding is defectively designed and/or manufactured such that it prematurely fails when exposed to natural conditions. The outward manifestation of Siding problems is blistering, material thinning, bowing, discoloration, and excessive gapping. The defects in the Siding are so severe that the Named Plaintiffs and the Class Members must repair or replace their Siding sooner than

reasonably expected, and certainly before the expected lifetime of the siding (the lifetime of the

Owner or 50 years).  In short, the Siding does not perform in accordance with AMI's

representations or the reasonable expectations of consumers that the Siding be durable and

suitable for use as a building product.

6.

AMI knew or reasonably should have known that the Siding is defective and that such

defects would cause damage to the homes or structures of the Named Plaintiffs and the Class

Members.  Moreover, AMI concealed the defective nature of the Siding from the Named

Plaintiffs and Class Members and refused to honor warranties on the Siding.  Indeed, on

information and belief, AMI revised its warranties to attempt to exclude damage from external

heat sources, or "unusual heat sources."

7.

Subsequently, consumers, including Named Plaintiffs, made warranty claims after their

Siding was damaged.  AMI denied their claims, stating that the damage to their Siding was

caused by "unusual heat sources" and/or "sun solarization" and that such damage caused by

"unusual heat sources" or "sun solarization" was excluded from the warranty.  However, AMI

retroactively applied their new warranty language as justification for its denial of warranty

claims made by Owners  whose actual warranties had no such exclusions.  Named Plaintiffs and

the Class Members did not have exclusions in their warranties for "unusual heat sources" or "sun

solarization" despite AMI's reliance on this language as the basis for denial of Named Plaintiffs'

warranty claims and the warranty claims of the Class.

/ / /

/ / /

8.

The Named Plaintiffs have each suffered damages as a result of AMI's concealment, deceptive practices, and refusal to honor the Siding warranties. Among other things, Named Plaintiffs' Siding is blistering, thinning, bowing, gapping, and/or the value of their properties have been diminished.

9.

The Named Plaintiffs seek to recover, for themselves and the Class, all costs associated with repairing, removing and/or replacing the Siding, as well as the costs of repairing any damage to their properties caused by the failure of the Siding to perform as represented and warranted. The Named Plaintiffs also seek injunctive relief requiring AMI to modify its warranty claims process so as to uniformly provide relief in accordance with its obligations under the law.

**PARTIES**

*THE NAMED PLAINTIFFS*

10.

Plaintiff Michael Harney is a citizen of Beaverton, Washington County, Oregon. Mr. Harney previously resided at 4321 NW Moon Valley Terrace, Beaverton, Washington County, Oregon (the "Moon Valley Terrace Residence"). Mr. Harney sold the Moon Valley Terrace Residence in October 2015. When Mr. Harney began to prepare the Moon Valley Terrace Residence for sale in summer of 2015, he noted blistering and distortion problems with the Alside vinyl Siding on the exterior of the property. Mr. Harney contacted Alside and was told that he would need to complete a Warranty Inquiry Packet. Mr. Harney completed a

Warranty Inquiry Packet for AMI, submitting all required documentation and materials in order to make a claim for repair, refinishing, or replacement of the defective siding.

11.

AMI responded to Mr. Harney's effective warranty demand with a phone call, and indicated that AMI was denying Mr. Harney's claim. Mr. Harney subsequently received a written response from AMI, stating that, "Our findings conclude that your particular concern is not the result of a manufacturing defect covered by the warranty."

12.

Mr. Harney contacted AMI's warranty department to discuss the denial. AMI representatives first lied to Mr. Harney and said a representative visited his property to inspect it. Subsequently, AMI representatives admitted that they had only used the Google Earth program to review satellite imagery of his home.

13.

When confronted with the inadequacy of the warranty denial, AMI persisted in the warranty denial for site specific reasons, including "sun solarization." "Sun solarization" is not an expressly identified exclusion in the then-applicable Alside warranty.

14.

Mr. Harney therefore was forced to pay his own material and labor costs in order to have the defective Siding replaced in order to proceed with the sale of the Moon Valley Terrace Residence. The building paper beneath Mr. Harney's distorted siding was also damaged, and needed to be replaced.

/ / /

/ / /

15.

Plaintiff Ozzie Gilbert owns the home at 1133 Cedar Log Place, Austell, Georgia 30168 (the "Gilbert Residence"), and resides at 4423 Felix Way SE, Smyrna, Georgia.  Ms. Gilbert purchased Alside vinyl siding ("Charter Oak, Dutch Lap") from a dealer/contractor engaged in door-to-door sales on AMI's behalf.  Ms. Gilbert's siding was installed on the Gilbert Residence or about May 16, 2000.  AMI issued an Alside Lifetime Limited Warranty to Ms. Gilbert. Neither the door-to-door sales dealer, nor AMI ever disclosed to Ms. Gilbert that the Siding was prone to melting and deformation under normal conditions. Additionally, it was not disclosed to Ms. Gilbert that such damage to her home and Siding was not covered under the Lifetime Limited Warranty.

16.

Sometime in 2014, Ms. Gilbert noticed warping, deformation, and buckling of a significant portion of the Siding on her home. She submitted a warranty claim to AMI on or about November 25, 2014.  AMI never inspected Ms. Gilbert's home to determine the cause or origin of the damaged siding, but nonetheless denied Ms. Gilbert's warranty claim, stating that the damage to her siding and home were not covered by the applicable warranty. To-date, the damage to the Gilbert Residence has not been repaired.

***DEFENDANTS***

17.

Defendant Associated Materials, LLC, dba Alside, dba Gentek Building Products, Inc. is a Delaware limited liability company with its principal place of business at 3773 State Rd, Cuyahoga Falls, Ohio 44223, and maintains an Oregon Supply Center for Alside product in Portland, Oregon, at 5205 NE 158th Avenue, Phase 11, Bldg 4, Portland, Oregon 97230.

According to its 2015 United States Securities and Exchange Commission Form 10-K filing, Associated Materials, LLC provides "a comprehensive offering of exterior building products, including vinyl windows, vinyl siding, vinyl railing and fencing, aluminum trim coil, aluminum and steel siding and related accessories, which we produce at our 11 manufacturing facilities." The filing also provides as follows: "We distribute our products through our extensive dual-distribution network to over 50,000 professional exterior contractors, builders and dealers, whom we refer to as our 'contractor customers.' This dual-distribution network consists of 122 company-operated supply centers, through which we sell directly to our contractor customers, and our direct sales channel, through which we sell to more than 260 independent distributors, dealers and national account customers." The filing also provides that vinyl siding sales constituted 17% of Association Materials, LLC's net sales for the 2015 calendar year, or $201,450,000 as reported.

18.

At all material times, Defendant Associated Materials Incorporated, dba Alside was a Delaware corporation with its principal place of business at 3773 State Rd, Cuyahoga Falls, Ohio 44223. On information and belief, Associated Materials Incorporated and Associated Materials, LLC (collectively, referred to above and herein as "AMI") are jointly and/or severally liable to the Named Plaintiffs and Class Members, both doing business as "Alside", sharing intellectual property, and as joint venturers, or in the alternative, operating such that any pretend corporate formalities among and between the two should be disregarded or pierced, or in the alternative, subject to an agency relationship, or in the alternative, subject to predecessor and successor liability theories, or in the alternative, jointly and severally liable for all acts and omissions alleged herein. The Named Plaintiffs are informed and believe, and based thereon allege that at

all times herein mentioned each of the Defendants was the agent, servant, successor, assign, joint

venturer, partner, and/or employee of the other Defendants, and in doing the things herein

alleged, was acting in the scope of his or her authority, and with the permission and consent of

his or her co-Defendants.  The Named Plaintiffs are informed and believe, and based thereon

allege that the Defendants acted in a common scheme or plan that resulted in injuries alleged

herein.

<strong>JURISDICTION AND VENUE</strong>

19.

Defendant AMI maintains a Registered Agent in the State of Oregon for service of

process in Oregon, and conducts substantial business in Oregon, including the sale and

distribution of Siding.  This Court has jurisdiction over Defendant because AMI maintains

sufficient contacts with Oregon and otherwise has intentionally availed itself of the laws and

markets of Oregon.

20.

This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d).  The Named Plaintiffs are

citizens of Oregon and Georgia, and AMI is a citizen of Delaware and/or Ohio.  Moreover, there

are more than 100 Class members residing in multiple states, and the amount in controversy

exceeds Five Million Dollars ($5,000,000).

21.

Venue is proper in this district pursuant to 28 U.S.C. § 1391 *et seq.* because a substantial

part of the events giving rise to the claim occurred in district boundaries, and to the extent the

events occurred in multiple locations, AMI is subject to this court's personal jurisdiction with

respect to this action.

Page 9 – SECOND AMENDED CLASS ACTION ALLEGATION COMPLAINT

## SUBSTANTIVE ALLEGATIONS

### *AMI Misrepresented the Siding's Characteristics and Breached its Warranties to the Class.*

22.

Since 1979, AMI's Alside has manufactured, sold or distributed Siding throughout the United States for installation on homes, commercial buildings, or other structures.  AMI's Gentek has produced its products for "nearly 50 years" according to its website. (http://www.gentekinc.com/default/AboutUs.aspx (last visited May 31, 2017)).

23.

AMI's statements in its documentation associated with its warranty include that "Alside Vinyl Siding is no ordinary siding.  It is the result of years of intensive research and development, giving you a vinyl siding of the highest standards."  (Warranty Documentation, Exhibit A to this pleading.)

24.

AMI's marketing literature, which was widely distributed to building professionals and was generally available to the Named Plaintiffs and the Class Members at the time of the sale from its website, states, among other things, "Vinyl won't split, peel or rot," and "PureStrength$^{TM}$ vinyl resin is the main ingredient in Alside vinyl siding.  It provides strength and weather resistance while preventing moisture infiltration, even in extreme weather.  Panels won't rot, warp, shrink or swell."  (http://www.alside.com/products/siding/features-and-benefits/quality-and-features/vinyl-siding-features) (last visited February 16, 2017)).  Gentek's website provides, in turn, "Built weather-tough, Gentek siding won't chip, peel, or rot like painted wood and requires very minimal upkeep. Just rinse occasionally with a garden hose to restore the siding's like-new beauty." (http://www.gentekinc.com/default/FAQ.aspx (last visited

May 31, 2017)).  "For added peace of mind, Gentek vinyl sidings are backed by strong lifetime limited warranties,* ensuring excellent quality and value for your home. * See printed warranty for complete details." (*Id.*).

AMI's Alside vinyl materials also expressly assure consumers that its product will stand up to the "hot summer sun": "Ti-Shield™ titanium dioxide prevents ultraviolet degradation, so even the hot summer sun won't damage your siding's beautiful surface." (*Id.*).  AMI's Alside website further provides as follows: "StayRight™ vinyl stabilizers help to prevent heat degradation during the manufacturing process and after installation." (*Id.*).

25.

AMI widely advertises that its Alside Siding carries a Lifetime Warranty, to "serve as our written pledge of lifelong quality and performance." (http://www.alside.com/support/warranties/ (last visited August 3, 2016)).  Building professionals and consumers appropriately and reasonably interpret AMI's Alside warranty and representations to mean that the product is expected to have an estimated useful life of the lifetime of the owner, or 50 years for entity owners.

26.

This is in keeping with the expectations of the public and professionals.  The website for the International Association of Certified Home Inspectors states as follows: "Outside siding materials typically last a lifetime." (https://www.nachi.org/life-expectancy.htm (last visited February 16, 2017)).  This Association publishes numerous tables with guideline life expectancies for products, and calculates that consumers and inspectors can expect vinyl siding to last "60" years. (*Id.*).

27.

Given the early and severe deterioration in the Siding that requires unexpected
maintenance and premature repair and replacement of the Siding and underlying property
damage, the Siding has not lived up to AMI's representations and warranties, nor the
expectations of the Named Plaintiffs, the Class Members, and consumers and industry
professionals.  On information and belief, AMI has amended its warranties over the years, and
has applied latter version exclusions to earlier claims which are covered by different warranty
language.

***AMI's Siding is Inherently Defective***

28.

The Siding experiences blistering, excessive shrinkage and expansion and long-term
material degradation.  Because of the blistering, excessive shrinkage and expansion, the Siding is
prone to shrinkage at seams and joints.

29.

The Siding's blistering, shrinkage and expansion has manifested itself on the Siding
installed on Named Plaintiffs' properties and the properties of Class members, and has been the
subject of several online blog posts in which consumers and home developers have given similar
details about: 1) the widespread defects inherent in the AMI Siding; and 2) AMI's failure to
honor its express and implied warranties with Class members and its efforts to obfuscate the true
nature of its defective Siding.

30.

The following represents a small sampling of internet postings by AMI Siding purchasers
and installers regarding their frustrations with the defective Siding [*sic* throughout]:

    a.      "I put Alside Charter Oak xl, Ivy Green on my house in 2004. The
house was only 8 years old, but had been sided with some kind of pressboard that
was deteriorating. So I had to make a $20,000 investment after owning the house

for only 6 years. After a lot of research, and weighing the pros and cons, I decided on vinyl siding. My house is very tall and painting would be very expensive, and I figured I would never have to paint again with Vinyl. Now, the siding is warping an buckling in one area on the house. I put together a warranty claim package, sent it in, and then after 2 weeks called Alside because I hadn't heard from them. They hadn't even looked at the claim and had trouble finding it. Once found, the woman looked at the picture for 30 seconds and said, we don't cover thermal issues. Oh, so Alside should not be installed on the outside of the house, or anywhere the sun shines? She then said it is because of reflection from the neighbors windows. I call bull on that. I have never seen the neighbors windows reflect light on my house. That side of the house is typically dark and shaded. The morning sun does shine part way through for awhile. I think this is "reflection" answer is just a canned answer. Even though it may happen, how can they deny my claim in 30 seconds without any kind of investigation or proof." (http://www.sidingcompare.com/vinyl-siding/reviews/alside/ (last visited May 25, 2016)).

b.     "Window reflection is also the excuse that Alside used for buckled siding that basically melted in the summer heat on the West side of our Wisconsin home. The product was installed 3 years ago, so it's supposed to be covered 100% by the bogus warranty. I ran this scenario by two family members who are both physics professors, and according to their calculations, light reflected off a window is not as hot as direct sun rays, confirming the other very unsatisfied client's thermometer study. I will have to pay my installer to replace the product just so I can sell my house. The installer himself stated that the product will melt in very hot weather, and that he is terribly embarrassed by Alside's behavior." (*Id.*).

c.     "Do not put this stuff on your home. The siding will basically melt when exposed to direct or reflective sunlight. Alside does not warranty the siding. If your siding color is discontinued, you may have to re side the entire home. This problem is proliferating around the entire country, some of it is due to Low-e reflective windows. There is no way to know if this will be a problem, but if your siding warps, twists, buckles and melts, NO ONE will admit any fault and help you remediate the problem. Claims that lead you to believe that putting vinyl siding on your home will let you lead a maintenance free life are lies." (http://www.researchvinylsiding.com/alside-charter-oak-siding-review-a-premium-vinyl-siding/ (last visited May 25, 2016)).

d.     The warranty doesn't exist. When you will call them your product won't be cover by the warranty. They have quality problem, some fade fast, some fade very fast. If you start from scratch by another brand you have nothing to lose. (http://www.sidingcompare.com/vinyl-siding/reviews/gentek/ (last visited May 31, 2017)).

31.

At present, upon information and belief, there are thousands of Class members, including

the Named Plaintiffs, whose homes or other structures incorporate AMI's defective Siding and

who have observed and otherwise experienced the uniform defects described herein.

***The Remedies Provided by the Warranty are Inadequate***

32.

AMI has received numerous warranty claims alleging a manufacturing or design defect in the Siding.  Despite receiving so many complaints from consumers (such as the Named Plaintiffs and other members of the Class), AMI has not notified consumers about the defects, and has refused to fully repair damage caused by the premature failure of its product.  Indeed, AMI has instead intentionally embarked on a campaign to blame any distortion in the Siding on "external" or "unusual heat sources," where AMI acts as the sole arbiter of any determination as to whether the cause of AMI's failing Siding is "unusual."  Furthermore, AMI appears to apply its current warranty language, terms, and exclusions to any and all claims, regardless of the specific terms of the warranty issued to the owner making the warranty claim, and regardless of AMI's knowledge of which warranty terms and exclusions applied at the time the specific owner's Siding was manufactured or sold, or which warranty was issued to the specific owner making the warranty claims.

33.

AMI's response to customers' warranty submissions and other requests for assistance and compensation is woefully inadequate and in breach of its obligations pursuant to the warranty it provides to its consumers.

34.

AMI's failure to address on a class-wide basis the defects inherent in its Siding, which have foreseeably resulted in the myriad problems described herein, constitutes a breach of its express and implied warranties to the Named Plaintiffs and the Class Members.  Moreover, AMI's affirmative representations as to the suitability and exemplary composition of its defective Siding constitute an actionable misrepresentation of material fact.

/ / /

/ / /

/ / /

35.

AMI warranted, advertised and sold to the Named Plaintiffs and the Class Members Siding products that it reasonably should have known were defectively designed and/or manufactured, and which failed prematurely.

36.

As a result of the foregoing, AMI's warranty was unconscionable at the time it was entered into, and failed of its essential purpose.

***Tolling of Statutes of Limitation***

37.

Until shortly before filing their respective claims, the Named Plaintiffs had no knowledge, nor reasonable basis to believe that the Siding on their properties was inherently defective. Indeed, because the defects in the Siding are latent and not detectable until manifestation, Class members could not reasonably discover their Siding was defective until after installation, despite the exercise of due diligence. At the time of first sale, building and construction professionals would not be able to detect the latent defect unless they subjected the Siding to their own testing, modeling or analysis.

38.

In addition, the Named Plaintiffs were impeded from discovering the defective nature of the Siding because of AMI's affirmative acts of concealment regarding the inherent defects of its Siding and the corresponding affirmative misrepresentations of material fact contained in its marketing materials regarding the exemplary nature and premier long-term durability of the Siding.

39.

Furthermore, upon information and belief, AMI has adopted a uniform standardized set of obfuscating responses to Class members who attempt to invoke the company's warranty coverage and who seek to hold AMI to its promises regarding its defective Siding. Specifically, agents of AMI, when reviewing warranty claims, have asserted to Class members that the Siding

defects were the result of "unusual heat sources," including unlisted conditions such as "sun solarization."

40.

Indeed, AMI's self-serving representations that the Siding defects were no more than the results of unusual heat sources constitute affirmative misrepresentations of material fact in light of the manifestation of defects inherent in the Siding purchased by the Named Plaintiffs and the Class Members.  This is exacerbated by AMI's unilateral application of incorrect warranty exclusions or terms which do not apply to the product about which a warranty claim is being made.  Likewise, such representations serve to conceal the truth concerning the true nature of AMI's defective Siding.

41.

At all times material hereto, AMI had a duty to disclose to the Named Plaintiffs and the Class Members that its Siding was defective, prone to foreseeable and uniform problems, such as shrinkage and other problems detailed herein, and otherwise was inherently flawed in its design such that the Siding was not suitable for use as an exterior building material.

**CLASS ALLEGATIONS**

42.

This action has been brought and may be properly maintained as a nationwide class action pursuant to Fed. R. Civ. P. 23, on behalf of a Class defined as follows:

> All individuals and entities that own, or have owned, homes or other structures physically located in the United States, on which vinyl Siding manufactured and/or sold by AMI is or has been installed. Excluded from the Class is the Defendant, any entity in which Defendant has a controlling interest or which has a controlling interest of Defendant, and Defendant's legal representatives, assigns and successors.

43.

Alternatively, or in addition to the nationwide Class claims, the Named Plaintiffs bring these claims under Fed. R. Civ. P. 23 on behalf of themselves and on behalf of Subclasses of individuals and entities residing in each of the states in which the Named Plaintiffs resides and

each of the states where the laws are similar to each of the states in which the Named Plaintiffs

reside.  ("State Subclasses.")  The State Subclasses are defined as:

> All individuals and entities that own, or have owned, homes or other structures physically located in the applicable State, on which Alside vinyl siding is or has been installed. Excluded from the Class is the Defendant, any entity in which Defendant has a controlling interest or which has a controlling interest of Defendant, and Defendant's legal representatives, assigns and successors.

44.

The Named Plaintiffs reserve the right to re-define the Class(es) prior to class

certification.

45.

Members of the Class are so numerous that their individual joinder is impracticable.

While the precise number is unknown at this time, upon information and belief, the proposed

Class may be comprised of at least thousands of members.  The true number of Class members is

likely to be known by Defendant and may be ascertained through its books and records.

46.

There are numerous questions of law and fact common to the Named Plaintiffs and the

Class Members, and those questions predominate over any questions that may affect individual

Class Members, including but not limited to:

    a.  Whether the Siding is defective;

    b.  Whether the Siding is not suitable for use as an exterior siding product for the duration of time advertised, marketed and warranted;

    c.  Whether AMI knew or should have known of the defective nature of the Siding prior to putting it into the stream of commerce for purchase by the Named Plaintiffs and the Class Members;

    d.  Whether AMI properly advised consumers about the likelihood of its Siding's premature failure;

/ / /

/ / /

Page 17 – SECOND AMENDED CLASS ACTION ALLEGATION COMPLAINT

e.  Whether AMI owed a duty to the Named Plaintiffs and the Class Members to exercise reasonable and ordinary care in the formulation, testing, design, manufacture, warranting and marketing of the Siding;

f.  Whether AMI breached its duty to the Named Plaintiffs and the Class Members by designing, manufacturing, advertising and selling to the Named Plaintiffs and the Class Members defective Siding and by failing promptly to remove the Siding from the marketplace or take other appropriate remedial action;

g.  Whether the siding material will continue to degrade in performance over time;

h.  Whether the Siding fails to perform in accordance with the reasonable expectations of ordinary consumers;

i.  Whether the Siding fails to perform as advertised, marketed and warranted;

j.  Whether AMI breached its express warranties to the Named Plaintiffs and the Class Members by advertising, marketing and selling defective Siding to the Named Plaintiffs and the Class Members;

k.  Whether AMI breached its implied warranties to the Named Plaintiffs and the Class Members by advertising, marketing and selling Siding that was not of a merchantable quality, nor fit for the ordinary purpose for which it was sold;

l.  Whether the Named Plaintiffs and the Class Members are entitled to compensatory damages, and the amount of such damages for the removal and replacement of the defective Siding, repair of underlying and resulting property damage, and compensation for the diminution in the values of the properties;

m. Whether AMI's representations regarding the suitability and exemplary nature of its Siding, and its omissions and concealment of facts to the contrary regarding the Siding defects constitute violations of Oregon's Unlawful Trade Practices Act and the similar laws of all other applicable States; and

n.  Whether AMI should be required to notify all Class Members about their defective Siding.

47.

The Named Plaintiffs' claims are typical of the claims of the members of the Class, in that the Named Plaintiffs, like all Class members, own their homes or other structures on which the defective Siding had been installed.  As a result of the uniform defects inherent in the Siding's formulation, and AMI's scheme for rejecting warranty requests, the Siding failed and will continue to fail prematurely without remedy, causing the Named Plaintiffs and all members of the Class to suffer damages in the form of unreimbursed costs associated with repairing or replacing the defective Siding.

48.

The Named Plaintiffs will fairly and adequately protect the interests of the Class Members.  The Named Plaintiffs have retained counsel with substantial experience in representing plaintiffs in real property, product, and defect actions.  The Named Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class Members they represent, and have the financial resources to do so.  Neither the Named Plaintiffs nor their counsel has any interest adverse or antagonistic to those of the Class Members.

49.

The Named Plaintiffs and the Class Members have all suffered and will continue to suffer harm and damages as a result of AMI's conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Absent a class action, the vast majority of Class Members likely would not be in a position to litigate their claims individually and would have no effective remedy at law through which to vindicate their claims against AMI and be made whole.  Class treatment of predominating common questions of law and fact would also be superior to multiple individual actions, in that class treatment would conserve the resources of the courts and the litigants, and will further efficient adjudication of Class member claims.

/ / /

/ / /

Page 19 – SECOND AMENDED CLASS ACTION ALLEGATION COMPLAINT

1118567v3

## CAUSES OF ACTION

## COUNT I

## BREACH OF EXPRESS WARRANTY

50.

The Named Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Second Amended Complaint.

51.

AMI marketed and sold its Siding with the intent that the Siding would be purchased by the Named Plaintiffs and Class Members.

52.

The written warranties that have been attached hereto constitute express warranties as set forth in ORS 72.8060 and Ga. Code Ann. § 11-2-313.

53.

In this warranty, AMI expressly states that the Siding shall be free from blistering, corroding, flaking, and peeling and is suitable for use as an exterior home product.  This express warranty, and the understanding that the Siding shall be suitable for use as an exterior home product, became the primary basis of the bargain between AMI and the Named Plaintiffs and the Class Members when they purchased the Siding for installation on their homes and structures.

54.

Specifically, AMI expressly warranted that the Siding purchased by the Named Plaintiffs and the Class Members would last for the life of a living owner, or a period of fifty years.  In fact, the Siding falls well short of this express promise and does not perform in accordance with the reasonable expectations of consumers that such products be durable and suitable for use as building products.  Owners report that the problems worsen over time indicating the material is degrading with continued exposure to the elements.

/ / /

/ / /

Page 20 – SECOND AMENDED CLASS ACTION ALLEGATION COMPLAINT

1118567v3

55.

AMI breached the express warranties to the Named Plaintiffs and the Class Members by designing, manufacturing, marketing and selling Siding that was not fit for its intended use as a durable and long-term exterior home building product.  As detailed herein, the Siding did not perform as expressly promised and is fraught with myriad uniform defects.

56.

Moreover, because AMI's express warranty provides only for repair and replacement costs (including labor) at AMI's discretion, Defendant's warranty does not compensate the Named Plaintiffs and the Class Members for any damages to their underlying homes and structures caused by the defective Siding, or for the diminution in the value of the Named Plaintiffs' and Class Members' homes and structures.

57.

Moreover, AMI appears to have revised its express warranties at some time to purport to exclude nonconformities caused by "unusual heat sources."  AMI has denied the meritorious warranty claims by the Named Plaintiffs based on this exclusion, despite the fact that the warranty terms and exclusions applicable to the Named Plaintiffs do not appear to contain any such exclusion for damages caused by "unusual heat sources."  Further, AMI also summarily denied the warranty claims of the Named Plaintiffs without visiting the affected properties or providing any reasonable basis to conclude that the damages were in fact the result of "unusual heat sources."  The Named Plaintiffs specifically dispute that the damages in the Siding on their properties was caused by "unusual heat sources."

58.

Indeed, to demonstrate the arbitrary and expansive potential of this purported exclusion, AMI has expressly referenced "sun solarization" in a denying one claim, an additional unnamed "unusual heat source," despite AMI's much more visible assurances during the marketing and sale process that "the hot summer sun won't damage" its Siding.  In doing so, AMI is attempting to impose terms and conditions upon the warranties they issued after the warranty had already

Page 21 – SECOND AMENDED CLASS ACTION ALLEGATION COMPLAINT

1118567v3

been issued, and after the purchasers of the Siding had relied upon the language of the original warranty when they chose to purchase the Siding originally.

59.

As alleged herein, AMI has denied and continues to deny its express obligations under the warranties to the Named Plaintiffs and the Class Members.

60.

In addition, privity exists because AMI made express representations to Named Plaintiffs and the Class Members about the nature and quality of the Siding and the Named Plaintiffs and Class Members are either directly in contract with AMI through AMI's express warranty or are third party beneficiaries to the contracts between AMI and its distributors.

61.

As a result of AMI's breach of its express warranties, the Named Plaintiffs and the Class Members have suffered actual damages, in that they have purchased and installed on their homes and other structures Siding that is defective and not at all suitable for its intended purpose. These defects have caused and will continue to cause the Named Plaintiffs and the Class Members to expend substantial resources repairing and/or replacing their Siding and to address any collateral damages to their underlying homes and structures proximately caused by the defective Siding, as well as a diminution in the value of their properties.

## COUNT II

## BREACH OF IMPLIED WARRANTY

62.

The Named Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Second Amended Complaint.

63.

AMI's express warranty has failed of its essential purpose.  AMI has consistently interpreted its warranty how it sees fit to deny warranty coverage, by (1) applying revised versions of its warranties to claims by owners to whom the revisions do not apply, and

(2) specifically interpreting the term "unusual heat source" so broadly that the warranty has failed of its essential purpose.  When an express warranty fails of its essential purpose, the aggrieved party may purpose other warranty-related causes of action under Oregon law and Georgia law.

64.

At all times material hereto, AMI manufactured and distributed its Siding to the Named Plaintiffs and the Class Members, and in so doing, impliedly warranted to them that the product was of merchantable quality and fit for the use for which it was intended in accordance with ORS 72.8020 – 8040 and Ga. Code Ann. §§ 11-2-314 and -315.

65.

AMI had reason to know the particular purpose for which the Siding was required and had reason to know or knew that the Named Plaintiffs and the Class Members were relying on the skill or judgment of AMI and/or its distributors and suppliers to select or furnish suitable goods for this purpose.

66.

In addition, the Named Plaintiffs and the Class Members relied on the skill and judgment of AMI in manufacturing, supplying, marketing, and describing its Siding to its distributors, to the public, to the Class Members, and in its written materials.

67.

The Siding was unfit for its intended use and it was not of merchantable quality, in that it was vulnerable (by virtue of its inherent latent defective formulation and not due to any secondary cause) to failure and malfunction in the myriad of ways detailed herein. As such, the Siding was not merchantable at the time of purchase, was not free from defects, and was not fit for its intended purpose, as warranted.

68.

As a result, AMI breached its implied warranties to the Named Plaintiffs and the Class Members by manufacturing and selling exterior siding with fundamental, inherent defects.

Page 23 – SECOND AMENDED CLASS ACTION ALLEGATION COMPLAINT

69.

Additionally, AMI knowingly allowed these warranties to be made to the Named Plaintiffs and the Class Members with the intent of inducing them to purchase its Siding even after being put on notice by the Named Plaintiffs and other Class Members of the failure of the Siding.

70.

Privity exists because the Named Plaintiffs and/or their predecessors-in-interest purchased their siding from an actual or apparent agent of AMI, such as AMI's authorized distributors and/or contractors.

71.

Privity also exists by virtue of the contractual relationship stemming from AMI's manufacturer's warranty provided in conjunction with the purchase of siding or transfer of the structure, which is enforceable by Named Plaintiffs and the Class as against AMI regardless of where, or from whom, the siding was acquired.

72.

AMI has breached the implied warranty of merchantability by failing to remedy the defect in the Siding within a reasonable amount of time.

73.

AMI has breached the implied warranty of fitness for a particular purpose by delivering Siding that was not fit for the purposes for which AMI knew it would be used, namely, as an exterior finish material on residences serving as weather protection for the underlying construction of residences and structures, adjacent to other residences and structures containing windows, doors, and other fenestrations.

74.

AMI knew or should have known that the siding contained a defect that allowed deformation and was defective, unmerchantable, and unfit for its intended use or purpose.

/ / /

Page 24 – SECOND AMENDED CLASS ACTION ALLEGATION COMPLAINT

1118567v3

75.

AMI had reasonable and adequate notice of the Named Plaintiffs' and the Class Members' claims for breach of implied warranty of merchantability, and failed to cure.

76.

AMI's conduct in selling and marketing the defective Siding, along with Defendants' failure to disclose to Named Plaintiffs and the Class the existence of the defect, is a breach of the implied warranty of merchantability.

77.

Furthermore, the Named Plaintiffs have lost the benefit of their bargains with AMI, because AMI purports to limit the remedies of the Named Plaintiffs to an express warranty which is not minimally adequate, in that AMI retains the right to interpret its warranty as it sees fit to deny warranty coverage, and to apply subsequent versions of its warranties to earlier product years where those revisions were not in place.  AMI has reserved the right to, and has in fact, added additional terms to its warranty, including its interpretations of the term "unusual heat sources," which independently caused the purported warranty to fail of its essential purpose, thereby permitting remedy under implied warranties.

78.

As a direct and proximate result of AMI's breach of its implied warranties, the Named Plaintiffs and the Class Members has suffered actual damages, in that they have purchased and installed on their homes and other structures a siding product that is defective and not at all suitable for its intended purpose. These defects have caused and will continue to cause the Named Plaintiffs and the Class Members to expend substantial resources repairing and/or replacing their Siding, as well as addressing any other damages, including property damage to their underlying homes and structures proximately caused by the defective Siding, and the diminution in the value of their properties.

/ / /

/ / /

**COUNT III**

**UNJUST ENRICHMENT**

79.

The Named Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Second Amended Complaint.

80.

Named Plaintiffs and the Class Members have conferred substantial benefits on AMI by purchasing AMI Siding from AMI, or from its agents for the purpose of the dissemination of its siding, and/or its distributors and suppliers.  AMI has knowingly and willingly accepted and enjoyed these benefits.  Named Plaintiffs and Class Members conferred the benefits in the form of payment in exchange for the Siding that had the purported quality and characteristics advertised by AMI and was accompanied by the purported "Lifetime" warranty advertised by AMI, which payment ultimately enriched AMI.

81.

AMI either knew or should have known that the payments rendered by the Named Plaintiffs and the Class Members were given and received with the expectation that the AMI Siding would perform as represented and warranted.  For AMI to retain the benefit of the payments under these circumstances is inequitable.

82.

AMI's acceptance and retention of these benefits under the circumstances make it inequitable for Alside to retain the benefit without payment of the value to the Named Plaintiffs and the Class Members.

83.

The Named Plaintiffs and the Class Members are entitled to recover from AMI all amounts wrongfully collected and improperly retained by AMI, plus interest thereon.

/ / /

/ / /

1118567v3

84.

As a direct and proximate result of AMI's wrongful conduct and unjust enrichment, the Named Plaintiffs and the Class Members are entitled to an accounting, restitution from, and institution of a constructive trust disgorging all profits, benefits, and other compensation obtained by AMI, plus attorneys' fees, costs and interest thereon.

## COUNT IV

## UNLAWFUL TRADE PRACTICES

85.

The Named Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Second Amended Complaint.

86.

The conduct described above and throughout this Amended Complaint constitutes unfair, deceptive, or unlawful trade practices in violation of Oregon Revised Statutes (ORS) 646.605 – 656 (the "Unlawful Trade Practices Act"), as more specifically set forth below.

87.

Alternatively, similar statutes, identical in their material respects, are in effect in many jurisdictions within the United States. *See* Ga. Code Ann. § 10-1-370, *et al*.

88.

The Siding is a "good" as defined in ORS 646.605(6), as the Siding may be obtained primarily for personal, family, or household purposes.

89.

At all material times, AMI was engaged in the course of its business marketing and selling the Siding to and for the public, including consumers such as the Named Plaintiffs and the Class Members.  In the course of its business, AMI communicated and made representations to the Named Plaintiffs and the Class Members.

/ / /

Page 27 – SECOND AMENDED CLASS ACTION ALLEGATION COMPLAINT

1118567v3

90.

In direct statements through marketing and warranty materials supplied to prospective purchasers, AMI represented that its Siding was free from defects, "no ordinary siding," and "the result of years of intensive research and development, giving you a vinyl siding of the highest standards."

91.

Concurrent with the delivery of the Siding sold, AMI and/or its agents expressly represented and/or implied (through affirmative statements or failures to disclose as set forth above and elsewhere herein) that the Siding had met the following approvals, characteristics, uses, benefits, qualities, grade and standards: The Siding did not have the inherent problems outlined above and elsewhere herein; the Siding was of the highest standards; the Siding would continue to serve its purpose under normal conditions for 50 years; that its formula "prevents ultraviolet degradation, so even the hot summer sun won't damage your siding's beautiful surface," and that the vinyl stabilizers in the siding "help to prevent heat degradation during the manufacturing process and after installation."

92.

AMI's representations were false. In fact, the Siding's approvals, characteristics, uses, benefits, qualities, grade, and standards were actually as set forth above and elsewhere herein.

93.

AMI violated ORS 646.608(1)(e), (g), and (t) and Ga. Code Ann. § 10-1-372 because:

(1)     The Siding did not have the approvals, characteristics, uses, benefits, grade, qualities, and standards represented by AMI;

(2)     The Siding was not of a particular standard, quality, or grade; and

(3)     AMI knew, or in the exercise of reasonable care should have known, that the Siding contained material defects and AMI failed to disclose such defects.

94.

AMI's representations regarding the Siding's qualities and characteristics were deceptive.
AMI's representations regarding the extent of coverage under their warranty was deceptive.

95.

The Named Plaintiffs reasonably relied on AMI's representations and failures to disclose,
to their detriment.

96.

AMI knew, or in the exercise of reasonable care should have known, that its conduct
constituted unlawful trade practices.  Accordingly, its violations were willful.

97.

As a direct and proximate result of AMI's violations, the Named Plaintiffs have suffered
ascertainable losses of money and property, and are entitled to recover those losses as set forth
above.

98.

The Named Plaintiffs are likewise entitled to recover its reasonable attorneys' fees and
costs pursuant to ORS 646.638(3) and Ga. Code Ann. § 10-1-373.

**COUNT V**

**DECLARATORY AND INJUCTIVE RELIEF**

99.

The Named Plaintiffs incorporate by reference each of the allegations contained in the
foregoing paragraphs of this Second Amended Complaint.

/ / /

/ / /

1118567v3

100.

The Named Plaintiffs, on behalf of themselves and the Class Members, seek a Court declaration of the following:

    a. The Siding has defects which cause it to fail, resulting in damage to property and the necessity of the removal and replacement of the Siding;

    b. The Siding has a defect in workmanship and material that causes failures;

    c. AMI knew of the defects in its Siding and that the limitations contained in its purported limited warranties are unenforceable;

    d. AMI shall re-audit and reassess all prior warranty claims on their Siding, including claims previously denied in whole or in part, where the denial was based on warranty or other grounds; and

    e. AMI shall establish an inspection program and protocol to be communicated to Class members that will require AMI to inspect, upon request, a Class Member's structure to determine whether a Siding failure is manifest.

## PRAYER FOR RELIEF

WHEREFORE, the Named Plaintiffs request that the Court grant the following relief, on behalf of himself and all others similarly situated:

    a. Enter an Order certifying the proposed Class of the Named Plaintiffs (and subclasses, if applicable), appointing the Named Plaintiffs as Class Representatives, and appointing the undersigned counsel as Class Counsel;

    b. Declare that AMI must notify all Class Members of the problems with its Siding;

    c. Enter an order enjoining AMI from further deceptive advertising, marketing, distribution and sales practices with respect to its Siding products, and requiring

Alside to remove and replace the Named Plaintiffs' and Class Members' Siding with a suitable alternative siding of the Named Plaintiffs' and Class Members' choosing;

d. Enter an award to Named Plaintiffs and the Class Members that includes compensatory, exemplary or punitive damages as allowed by Oregon law or other law, and statutory damages, including interest thereon, in an amount to be proven at trial;

e. Declare that AMI must account for and disgorge, for the benefit of the Class Members, all or part of the ill-gotten profits it received from the sale of its Siding, or order AMI to make full restitution to the Named Plaintiffs and members of the Class;

f. Award pre-judgment and post-judgment interest at the maximum rate allowable by law;

g. Award reasonable attorneys' fees and reimbursement of costs incurred by the Named Plaintiffs and his counsel in connection with this action; and

h. Award such other and further relief as the Court deems just and proper.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Page 31 – SECOND AMENDED CLASS ACTION ALLEGATION COMPLAINT

1118567v3

*JURY DEMAND*

The Named Plaintiffs, on behalf of themselves and the Class Members, hereby demand trial by jury on all issues so triable.

DATED:  August 3, 2017.                    Respectfully submitted,


By:  /s/ Robert W. Wilkinson

**Robert W. Wilkinson,** OSB No. 993983
rwilkinson@balljanik.com
**Justin D. Monahan**, OSB No. 065839
jmonahan@balljanik.com
BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, Oregon  97204-3219
503-228-2525
Fax 503-226-3910

**Alex M. Nelson**, *pro hac vice*
anelson@bensonpc.com
**Michael J. Lowder**, *pro hac vice*
mlowder@bensonpc.com
BENSON, KERRANE, STORZ & NELSON, P.C.
110 North Rubey Drive, Suite 200
Golden, CO  80403
(720) 898-9680
Fax (720) 898-9681

Attorneys for Plaintiffs

# Vinyl Siding Lifetime Limited Warranty

Alside Premium Vinyl Siding and Soffit are warranted by Alside against blistering, corroding, flaking and peeling as a direct result of defects occurring in the manufacturing process, under normal use and service, subject to the terms and conditions contained in this Warranty.

If Alside determines that a claim is valid in accordance with the terms of this Warranty, Alside agrees, at its sole option, to repair, refinish or replace only the defective siding panels and assume 100% of the cost of material and labor to the Property Owner.

In the event that the building upon which the warranted siding and/or soffit have been installed comprises multiple residential or commercial units, including condominiums, then each individually addressed unit shall be deemed to be a separate property owner unit for all applicability purposes of this Limited Warranty. For an entity other than living persons, the warranty period shall be for fifty (50) years from the original date of installation, under this Limited Warranty.

### Transferability Provisions

This limited lifetime warranty (this "Warranty") remains in effect for as long as the owner(s) of the property to which the Products were originally applied (the "Original Property Owner(s)") continues to live in and to own the property. In the event that there is more than one Original Property Owner, this warranty will remain in effect as long as one of the Original Property Owners is living and owns an interest in the property. Upon change in ownership, this Warranty may be transferred to the new owner(s) ("Subsequent Transferee(s)") as a Fifty (50) Year non-prorated Warranty from the date of original installation of the Products.

### Exclusions

Alside does not warrant installation nor defects caused by installation. This Warranty covers only the specific manufacturing defects as specified herein. This Warranty does not cover any other damages or material

failure including, but not limited to, normal weathering, oxidation, Acts of God, fire, flood, impact from foreign objects, chemical pollutants, mildew, structural defects, negligent maintenance or abuse. Normal weathering may cause any surface to collect, chalk or accumulate surface dirt or stains due to varying exposure to sunlight, weather and atmospheric conditions. The geographic location, the quality of the atmosphere and other local factors in the area, over which Alside has no control, contribute to the severity of these conditions. This Warranty is valid only if genuine Alside Premium Vinyl Siding or Soffit are used, but shall be void if accessory Products incompatible with the siding or soffit are installed which cause defects to occur.

### Fading Protection

Even though fading may be excluded under the terms of this Warranty as normal weathering, for a period of five (5) years from the date of the original installation of the Products, Alside will cover siding on the following basis: Alside upon notification and validation of the complaint, will solely at its option, either repair, replace or refinish (providing materials and labor) Products that have faded, provided such fading is in excess of 4 Hunter units of Delta E, as determined by Alside. Due to normal weathering, replacement Products may differ in gloss and color from Products that were originally installed.

### Hail

Alside Premium Vinyl Siding and/or Soffit is also warranted against damage from hail. In such cases, upon authorization, the replacement materials only are covered. In the case of hail damage, the homeowner should first pursue their homeowners' insurance policy for coverage thereunder. In the event that coverage is denied by insurance carrier, homeowner will be entitled to the hail protection coverage hereunder. All other costs of replacement of hail-damaged Products, including the cost of labor, shall be the sole responsibility of the Original Property Owner(s) or subsequent owner(s) of the property.

### Claims Handling

Any claim for defect under this Warranty must be reported to Alside Consumer Services Group, 1-800-489-1144 within the warranty period and promptly after discovery of the claimed defect, describing the defect claimed. Proof of product purchase and proof of property ownership is required for coverage hereunder. The homeowner may be asked to complete a questionnaire and submit photos and/or samples, or at Alside's option, a reasonable time shall be allowed for inspection purposes. The obligation of Alside, under this Warranty, shall be performed only by persons designated and compensated by Alside for that purpose and is subject to all other provisions of this Warranty.

The original warranty shall not be extended by any such work performed, but the remaining warranty time period shall continue in effect and be applicable under the terms and conditions of this Warranty to the warranty work performed. A color variance may occur between any new replacement panel in comparison to the originally installed panels due to weathering exposure and would not be indicative of defective siding or soffit. Alside reserves the right to discontinue or change any siding or soffit as manufactured. If the siding or soffit originally installed is not available and Alside determines to replace the defective siding, Alside shall have the right to substitute siding or soffit designated by Alside to be of equal quality. Alside may elect to refund the original purchase price for only the defective material.

The provisions of this Warranty are the full and complete warranty policy extended by Alside.

This Warranty shall remain in effect only if normal cleaning practices are performed for maintenance of the siding or soffit. (See Care and Cleaning.) This Warranty shall be null and void if harmful cleaning compounds are used.

THE WARRANTY STATEMENTS CONTAINED IN THIS LIMITED WARRANTY SET FORTH THE EXPRESS WARRANTIES EXTENDED BY ALSIDE AND ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED. FOR THE SIDING OR SOFFIT, THE PROVISIONS OF THIS WARRANTY SHALL CONSTITUTE THE ENTIRE LIABILITY OF ALSIDE AND SHALL BE THE PROPERTY OWNER'S EXCLUSIVE REMEDY FOR BREACH OF THIS WARRANTY. ALSIDE SHALL NOT BE LIABLE TO THE PROPERTY OWNER FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY KIND FOR BREACH OF ANY EXPRESS OR IMPLIED WARRANTY ON THE SIDING OR SOFFIT.

Some states do not allow the exclusion or limitation of incidental or consequential damages, so the above limitations or exclusion may not apply to you. This Warranty gives you specific legal rights and you may also have other rights which vary from state to state.



NO POSTAGE
NECESSARY
IF MAILED
IN THE
UNITED STATES

BUSINESS REPLY MAIL
FIRST-CLASS MAIL    PERMIT NO 2154    AKRON OH
POSTAGE WILL BE PAID BY ADDRESSEE

ATTN: MARKETING DEPARTMENT
ALSIDE, INC.
PO BOX 2010
AKRON  OH  44398-9946

NAME _____
ADDRESS _____
CITY _____ STATE ____ ZIP ____





AMI000000802

AMI000000799

To better understand our customers, we ask you to please fill out the following information. This information will be used in an internal research capacity only and will not be sold or given to anyone else.

Number of people in household
____ 1  ____ 3-5  ____ more 5

Age Group:
____ under 30  ____ 30-40  ____ 41-50  ____ 51-65  ____ over 65

Marital Status:
____ Single  ____ Married  ____ Divorced  ____ Widowed

Household Income (in thousands):
____ under $20  ____ $21-40  ____ $41-60  ____ $61-80
____ $81-100  ____ $101-120  ____ $121-140  ____ over $140

How would you classify your occupation:
____ Professional  ____ Sales/Business  ____ Clerical  ____ Technical
____ Other  ____ Manufacturing  ____ Self-employed  ____ Retired

Age of Home:
____ less than 5 years  ____ 5-10 years  ____ 11-20 years
____ 21-34 years  ____ 35-50 years  ____ over 50 years

How long have you lived in your home:
____ 1-5 years  ____ 6-10 years  ____ 11-15 years  ____ over 15 years

Purchase Information:
____ First-time purchase  ____ Bought previously from this company
____ Purchased during renovation  ____ Purchased from this company before

What was your method of payment?
____ Cash  ____ Financing

What product(s) did you purchase?

How did you hear about your Alside siding dealer?
____ Referral  ____ Newspaper  ____ Radio  ____ TV  ____ Yellow Pages
____ Remodeling Contractor  ____ Trade Show  ____ Other

Why did you decide on Alside Siding?
____ Appearance  ____ Price  ____ Reputation  ____ Other
____ Recommended by contractor

If you are replacing existing siding, why are you doing it now?
____ Appearance  ____ Ease of Maintenance  ____ Other

Thank you for choosing Alside Vinyl Siding.

Alside Premium Vinyl Siding is no ordinary siding. It is the result of years of intensive research and development, giving you a vinyl siding of the highest standards.

We take great pride in the quality of our Products. So much, in fact, that we back it with a Lifetime Limited Non-Prorated Warranty.

We hope you take pride and pleasure in the Alside Product you have chosen from your contractor and will consider recommending it to your friends and neighbors.

Thank you.

Alside

**The Care and Cleaning of Vinyl Siding & Soffit**
Like any other exterior siding surface, Alside Premium Vinyl Siding and Soffit will have dirt exposure from atmospheric conditions. Ordinarily, the cleaning action of rain will be adequate to wash the vinyl siding; however, vinyl siding and soffit should be washed periodically by hosing with a garden hose and clear water particularly in those areas not exposed directly to rain. If you desire to do a more thorough cleaning, or where high soil collection conditions occur, follow these simple instructions.

1. Use a soft-bristled, long-handled washing brush. It attaches to your garden hose and makes washing your siding easier. Do not rub vigorously, as this may create glossy areas over the vinyl siding finish.

2. For hard-to-remove dirt, such as soot and grime found in industrial areas, wipe the siding down with a solution consisting of the following ingredients:
   1/3 cup powdered detergent (Tide, Jade or equivalent powder detergent)
   2/3 cup household cleaner (Soilax, Spic-O-Span or equivalent)
   1 gallon water

3. If mildew is a problem, prepare the solution above but substitute 1 quart of laundry bleach for 1 quart of water.

4. If you wash down the entire house, start at the bottom and work up to the top, as less streaking will result.

5. It is important that immediately following all washing operations, the surface be thoroughly rinsed with fresh water from a garden hose. Avoid prolonged or high pressure rinsing of clean, ventilated areas.

6. For best results when using a cleaning solution, select an overcast cool day 55-75°F and wash only small areas at a time. This should allow the wet cleaning solution to remain in contact with the finish for a period of not less than 3 minutes; then rinse with clear water before it has a chance to dry.

CAUTION: GREATER CONCENTRATIONS MAY CAUSE DAMAGE TO THE VINYL SIDING FINISH. DO NOT USE CLEANERS CONTAINING ABRASIVE PARTICLES, SOLVENT OR AMMONIATED-TYPE CLEANERS OR PAINT REMOVER FOR CLEANING THE VINYL SIDING. WHEN USING ANY OF THE ABOVE CHEMICAL CLEANING AGENTS, OBSERVE THE CHEMICAL MANUFACTURER'S RECOMMENDED SAFETY PRECAUTIONS. PROTECT AGAINST CONTACT WITH THE SOLUTION WITH EYES OR SKIN.

This cleaning and maintenance information is suggested in an effort to be of assistance; however, Alside can assume no responsibility for results obtained which are dependent on the solution chemicals so prepared and method of application.

Want to Know more?
Visit our website at www.alside.com

Alside, Inc.
P.O. Box 2010
Akron, Ohio 44309-9946
800.922.6009

© 2002 Alside, Inc.  Printed in U.S.A.  85376  75-2954-01



PREMIUM VINYL SIDING SYSTEMS

*Siding*

**Vinyl Siding Lifetime Limited Warranty**

NON-PRORATED / TRANSFERABLE

ORIGINAL PURCHASER / PRESENT PROPERTY OWNER
PROPERTY ADDRESS
CITY          STATE          ZIP
PHONE                        DATE OF INSTALLATION
DEALER NAME

Exhibit A
Page 2 of 4

*Care and Maintenance of Vinyl Siding & Soffit.* Like any other exterior siding surface, AMI Vinyl Siding and Soffit will have dirt exposure from atmospheric conditions. Ordinarily, the cleaning action of rainfall will be adequate to wash the vinyl siding. However, vinyl siding and soffit should be washed periodically by rinsing with a garden hose and clear water particularly in those areas not exposed directly to rain. If you desire to do a more thorough cleaning, or where high soil collection conditions occur, follow these simple instructions.

1. Use a soft-bristled, long-handled washing brush (it attaches to your garden hose and makes washing your siding easier). Do not rub vigorously, as this may create glossy areas over the vinyl siding finish.

2. For hard-to-remove dirt, such as soot and grime found in industrial areas, wipe the siding down with a solution consisting of the following ingredients:

1/3 cup powdered detergent (Tide, Fab or an equivalent powder detergent)
2/3 cup household cleaner (Soilax, Spic & Span or the equivalent)
1 gallon water

3. If mildew is a problem in your area, prepare the solution above but substitute 1 quart of laundry bleach for 1 quart of water.

4. If you wash down the entire house, start at the bottom and work up to the top, as less streaking will result.

5. It is important that immediately following all washing operations, the entire surface be thoroughly rinsed with fresh water from a garden hose. Avoid prolonged or high pressure rinsing of open, ventilated areas.

6. For best results when using a cleaning solution, select a small area (approximately 25'-75') and only small areas at once. This should allow the wet cleaning solution to remain in contact with the finish for a period of not less than 3 minutes; then rinse with clear water before it has a chance to dry.

CAUTION: GREATER CONCENTRATIONS MAY CAUSE DAMAGE TO THE VINYL SIDING FINISH. DO NOT USE CLEANERS CONTAINING ABRASIVE PARTICLES, SOLVENT OR AMMONIATED-TYPE CLEANERS OR PAINT REMOVER FOR CLEANING THE VINYL SIDING. WHEN USING ANY OF THE ABOVE CHEMICAL CLEANING AGENTS, OBSERVE THE CHEMICAL MANUFACTURER'S RECOMMENDED SAFETY PRECAUTIONS. PROTECT AGAINST CONTACT OF THE SOLUTION WITH EYES OR SKIN.

This cleaning and maintenance information is suggested in an effort to be of assistance; however, AMI can assume no responsibility for results obtained which are dependent on the solution chemicals as prepared and method of application.

---

Thank you for choosing AMI Premium Vinyl Siding

AMI Premium Vinyl Siding is no ordinary siding. It is the result of years of intensive research and development, giving you a vinyl siding of the highest standards.

We take great pride in the quality of our vinyl siding.

So much, in fact, that we back it with the AMI Lifetime Owner's Protection Policy-Limited Warranty.

May we suggest you share the pride and pleasure of the AMI Premium Vinyl Siding you've purchased from your contractor by recommending it to your friends and neighbors.

*Thank You.*

---

© 2003 Associated Materials, Inc.   Printed in U.S.A.   12/03

ASSOCIATED MATERIALS®
I N C O R P O R A T E D

Vinyl Siding
Lifetime Limited
Warranty

*Transferable to the next homeowner.*

Exhibit A
Page 3 of 4

AMI Vinyl Siding and Soffit are warranted by Associated Materials, Inc. (AMI) against blistering, corroding, flaking and peeling as a direct result of defects occurring in the manufacturing process, under normal use and service, subject to the terms and conditions contained in this Warranty.

If AMI determines that a claim is valid in accordance with the terms of this Warranty, AMI agrees, at its sole option, to repair, refinish or replace only the defective siding panels and assume 100% of the cost of material and labor.

In the event that the building upon which the warranted siding have been installed comprises multiple residential or commercial units, including condominiums, then each individually addressed unit shall be deemed to be a separate property owner unit for all applicability purposes of this Limited Warranty. The color variance warranty period shall be for fifty (50) years from the original date of installation, under this Limited Warranty.

*Transferability Provisions*
This limited lifetime Warranty (this "Warranty") remains in effect for as long as the owner(s) of the property to which the Products were originally applied [the "Original Property Owner(s)"] continues to live in and to own the property. In the event that there is more than one Original Property owner, this Warranty will remain in effect as long as one of the Original Property Owners is living and owns an interest in the property. Upon change in transferee(s), this Warranty may be transferred to the next owner(s) ("Subsequent Transferee(s)"). A fifty (50) Year, Limited Non-Prorated Warranty beginning from the date of original installation of Products. Upon transfer, fade shall be covered as set forth in the Fade Protection Schedule.

*Exclusions*
AMI does not warrant installation nor defects caused by installation. This Warranty covers only the specific manufacturing defects as specified herein. This Warranty does not cover any other damages or material failure including, but not limited to, normal weathering, oxidation, Acts of God, fire, flood, impact from foreign objects, chemical pollutants, mildew, surface oxidation, negligent maintenance and/or misuse. Normal weathering may cause any surface to become dirty or stain due to varying exposures. The quality of the atmosphere and other local factors in the area, over which AMI has no control, contribute to the severity of these conditions. This Warranty is valid only if genuine AMI Vinyl Siding or Soffit are used, but shall be void if accessory products incompatible with the siding or soffit are installed which cause defects to occur.

*Lifetime Limited Fade Protection*
AMI warrants that the Products will not excessively fade. Excessive fade is defined as a change greater than 4 Hunter Units of Delta E. This limited lifetime Fade Protection remains in effect for as long as the owner(s) of the property to which the Products were originally installed (the "Original Property Owner(s)") continues to live in and to own the property. For an entity other than living persons, the Fade Protection period shall be for fifty (50) years from the original date of installation under this Limited Warranty prorated under the following schedule.

*AMI Will Cover Fade on the Following Basis:*
AMI, upon notification and validation of the complaint, will, solely at its option, either repair, replace or refinish existing materials and labor, Products that have faded, provided such fading is in excess of 4 Hunter units of Delta E.

### Fade Protection Schedule

| Number of Years from Installation Date to Claim Date | % of Purchase Price of Originally installed Products found to be Defective for which AMI will be Responsible |
|---|---|
| During original purchaser's property ownership | 100% |
| Subsequent Owners and others covered by a 50-year prorated Warranty: 0-5 years | 100% |
| More than 5 but less than 7 | 90% |
| More than 7 but less than 8 | 80% |
| More than 8 but less than 9 | 70% |
| More than 9 but less than 10 | 60% |
| More than 10 but less than 11 | 50% |
| More than 11 but less than 12 | 40% |
| More than 12 but less than 13 | 30% |
| More than 13 but less than 14 | 20% |
| More than 14 but less than 50 | 10% |

Due to normal weathering, replacement Products may differ in gloss and color from Products that were originally installed. Our obligations under this Warranty will in no event exceed the purchase price of the originally installed Products determined by AMI to be defective and the cost of the labor involved in the original installation of such defective Products. Any additional costs beyond these amounts are the property owner's responsibility.

*Hail*
AMI Vinyl Siding and/or Soffit is also warranted against damage from hail. In such cases, upon authorization, the replacement materials only are covered. In the case of hail damage, the homeowner should first pursue their homeowners' insurance policy for coverage. In the event that coverage is denied by insurance carrier, homeowner will be entitled to the hail protection coverage hereunder. All other costs of replacement of hail-damaged Products, including the cost of labor, shall be the sole responsibility of the Original Property Owner(s) or subsequent Owner(s) of the property.

*Claim Handling*
Any claims for defects under this Warranty must be reported to AMI, Associated Materials, Inc. 1-800-899-1144 within the Warranty period and promptly after discovery of the claimed defect describing the defect claimed. Proof of product purchase and proof of property ownership is required for coverage under this Warranty. The homeowner may be asked to complete a questionnaire and submit photos and/or samples, or at AMI's option, a reasonable time shall be allowed for inspection purposes. The obligation of AMI, under this Warranty, shall be performed only by persons designated and compensated by AMI for that purpose and is subject to all other provisions of this Warranty.

The original Warranty shall not be extended by any such work performed, but the remaining Warranty time period shall continue in effect and be applicable under the terms and conditions of this Warranty to the original installed panels. In the event that new replacement panels occur between any new product introduction to the original installed panels due to weathering exposure and would not be indicative of defective siding, AMI reserves the right to discontinue or change any siding or soffit as manufactured. If the siding or soffit originally installed is not available and AMI determines to replace the defective siding, AMI shall have the right to substitute siding or soffit designated by AMI to be of equal quality. AMI may elect to refund the original purchase price for only the defective materials.

the provisions of this Warranty are the full and complete Warranty policy extended by AMI.

This Warranty shall remain in effect only if normal cleaning practices are performed for the maintenance of the siding or soffit. (See Care and Cleaning.) This Warranty shall be null and void if harmful cleaning compounds are used.

THE WARRANTY STATEMENTS CONTAINED IN THIS LIMITED WARRANTY SET FORTH THE EXPRESS WARRANTIES EXTENDED BY ASSOCIATED MATERIALS INCORPORATED AND ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, FOR THE SIDING OR SOFFIT. THE PROVISIONS OF THIS WARRANTY SHALL CONSTITUTE THE ENTIRE LIABILITY OF ASSOCIATED MATERIALS INCORPORATED AND SHALL BE THE PROPERTY OWNERS EXCLUSIVE REMEDY FOR BREACH OF THIS WARRANTY. ASSOCIATED MATERIALS INCORPORATED SHALL NOT BE LIABLE TO THE PROPERTY OWNER FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY KIND FOR BREACH OF ANY EXPRESS OR IMPLIED WARRANTY ON THE SIDING OR SOFFIT.

Some states do not allow the exclusion or limitation of incidental or consequential damages, so the above limitations or exclusions may not apply to you. This Warranty gives you specific legal rights and you may also have other rights, which vary from state to state.

LIFETIME LIMITED WARRANTY

ASSOCIATED MATERIALS INCORPORATED



Exhibit A
Page 4 of 4

AMI000000788

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that I served a full, true and correct copy of the foregoing **SECOND AMENDED CLASS ACTION ALLEGATION COMPLAINT** by:

3

☐ U.S. Postal Service

4

☒ Electronically, utilizing CM/ECF
☐ Facsimile

5

☐ Arranging for hand delivery [as indicated]
☐ Overnight mail

6

☒ Electronic mail, via Outlook

7

addressed to the following named persons at their last known addresses:

8

Alex M. Nelson, *Pro Hac Vice*
Michael J. Lowder, *Pro Hac Vice*

9

Benson, Kerrane, Storz & Nelson, P.C.
110 North Rubey Drive, Suite 200

10

Golden, CO  80403
P: (720) 898-9680

11

F: (360) 501-5575
anelson@bensonpc.com

12

mlowder@bensonpc.com

13

*Co-Counsel for Plaintiffs*

14

Darin M. Sands
Lane Powell PC
601 SW Second Avenue, Suite 2100
Portland, OR  97204-3158
P: (503) 778-2117
F: (503) 778-2200
sandsd@lanepowell.com

Michael K. Farrell, *Pro Hac Vice*
Sam A. Camardo, *Pro Hac Vice*
Daniel M. Kavouras, *Pro Hac Vice*
Baker & Hostetler LLP
127 Public Square, Suite 2000
Cleveland, Ohio 44114
P: (216) 621-0200
F: (216) 696-0740
mfarrell@bakerlaw.com
scamardo@bakerlaw.com
dkavouras@bakerlaw.com

15

16

17

18

*Attorneys for Defendants*

19

DATED August 3, 2017.

BALL JANIK LLP

20

21

By: /s/ Annette Kimmel
     Annette Kimmel, Legal Assistant

22

23

**Robert W. Wilkinson, OSB No. 993983**
rwilkinson@balljanik.com

24

**Justin D. Monahan, OSB No. 065839**
jmonahan@balljanik.com
Facsimile:  503-295-1058

25

26

Attorneys for Plaintiffs

Page 1 - CERTIFICATE OF SERVICE